UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Brittany Haas, individually and on behalf of all others similarly situated, | 1:22-cv-00375 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| Aldi Inc., | Jury Trial Demanded |
| Defendant | |

Plaintiff alleges upon information and belief, except for allegations pertaining to Plaintiff, which are based on personal knowledge:

1. Aldi Inc. ("Defendant") manufactures, labels, markets, and sells pretzels purporting to be covered in white fudge under the Choceur brand (the "Product").



2. The representation as "White Fudge [Covered Pretzels]" is false, deceptive and misleading because it lacks the types and amounts of ingredients consumers expect in fudge.

## I. WHAT IS FUDGE

3. Fudge "is a type of sugar candy that is made by mixing sugar, butter and milk."[1]

4. Though fudge can have any flavor, milkfat is the central component.

5. An 1893 recipe for fudge called for "Four cups granulated sugar; one cup cream; one cup water; one-half cake chocolate; one-half Cup butter."[2]

6. In 1896, The Los Angeles Times published the original recipe by the Vassar students credited with first making fudge, which included "Two cups of sugar, one cup of milk, a piece of butter one-half the size of an egg."[3]

7. A 1902 fudge recipe from Mrs. Rorer's New Cook Book includes:

> 4 ounces of chocolate
> 2 cups of sugar
> 1 teaspoonful of vanilla
> 1/2 cup of milk
> 1 rounding tablespoonful of butter

8. Molly Mills, one of today's leading authorities on fudge, recently described it as made "most commonly from butter, milk, sugar, and chocolate."[4]

9. The Oxford Companion to Sugar and Sweets notes that:

> Traditionally, fudge is made by gently boiling granulated sugar and milk to the soft-ball stage (234° to 240°F/ 112° to 115°C); adding butter; cooling the mixture somewhat (120°F/49°C); then beating until thick, creamy, and less glossy.[5]

---

[1] Wikipedia contributors. "Fudge." *Wikipedia, The Free Encyclopedia*. Wikipedia, The Free Encyclopedia, 5 Jan. 2021. Web. 8 Jan. 2021.
[2] Mrs. J. Montgomery Smith, of Wisconsin, Alternate Lady Manager.
[3] Los Angeles Times, "'Fudges' Are Vassar Chocolates," May 11, 1896, p.2.
[4] Molly Mills, Come Get Your Fudge: 40 Tasty and Creative Fudge Recipes for Everyone, Amazon Digital Services LLC, June 11, 2019.
[5] Goldstein, Darra, and Sidney Mintz. The Oxford companion to sugar and sweets. Oxford University Press, 2015.

10. An A-Z of Food and Drink, an authoritative treatise, describes fudge as "a sort of soft, somewhat toffee-like sweet made by boiling together sugar, butter, and milk."[6]

11. A leading textbook on confectionary science and technology offers a model commercial formulation for fudge which includes between eight and sixteen percent butter and between twelve and twenty percent sweetened condensed milk.

10.2 Formulations and Ingredients 275

Table 10.1 Typical batch formulations (in %) for caramel, fudge and toffee

| | Commercial caramel (ungrained) | Caramelized sugar caramel | Fudge | English toffee (American) |
|---|---|---|---|---|
| Water | 15–25 | 0 | 10–15 | 8–10 |
| Sucrose | 10–20 | 55–65 | 30–50 | 45–55 |
| Glucose syrup (42 DE) | 36–46 | 0–5 | 10–20 | 0 |
| Sweetened condensed milk[a] | 20–40 | 0 | 12–20 | 0 |
| Cream | 0 | 25–35 | 0 | 0 |
| Butter[b] (fat) | 5–15 | 6–12 | 8–16 | 40–50 |
| Fondant | 0 | 0 | 3–5 | 0 |
| Chocolate liquor/cocoa powder | 0 | 0 | 0–10 | 0 |
| Salt | 0.2–0.5 | 0.2–0.5 | 0.2–0.5 | 0.3–0.6 |
| Vanilla | 0.1–0.3 | 0.1–0.3 | 0.1–0.3 | 0.1–0.3 |
| Lecithin | 0–0.4 | 0–0.4 | 0–0.4 | 0.25–0.45 |
| Nuts (unroasted) | 0 | 0 | 0–12 | 6–12 |

[a]Other dairy ingredients might include evaporated milk or dried milk powder
[b]Salted butter needed for toffee

12. Dictionaries confirm the definitions held by home cooks, confectionery scholars, and everyone in between.

13. Google Dictionary – based on its leading search engine that discovers the most relevant and accurate information – defines fudge as "a soft candy made from sugar, butter, and milk or cream."[7]

14. Encyclopedia Britannica defines fudge as a "creamy candy made with butter, sugar, milk."[8]

15. The Oxford Dictionary defines fudge as "a type of soft brown sweet made from sugar, butter and milk."

---

[6] John Ayto, An A-Z of Food and Drink, Oxford University Press, 2002, p. 133.
[7] Fudge definition – Google search.
[8] Britannica, The Editors of Encyclopaedia. "fudge." Encyclopedia Britannica.

16. The Cambridge Dictionary defines fudge as "a soft sweet made from sugar, butter, and milk."[9]

17. Collins Dictionary defines fudge as "a soft brown candy that is made from butter, cream, and sugar."[10]

18. Macmillan Dictionary defines fudge as a "soft brown sweet food made from sugar, butter, and milk or cream."[11]

19. The role of milkfat in fudge is not anachronistic or outdated, seen through the common, consistent definitions of fudge over more than a century, in sources ranging from journals to academic treatises, to the most mainstream dictionaries.

20. In the context of commercial manufacturing, dairy ingredients are used in a dry and concentrated form, i.e., whole milk and milkfat powder.

## II. DAIRY FAT INGREDIENTS ARE ESSENTIAL TO FUDGE

21. The quality of fudge depends on the amount and type of milkfat-contributing ingredients.[12]

22. The small droplets of fat are dispersed throughout the fudge mass, providing lubricity, and imparting desirable flavor release.[13]

23. According to Food Emulsifiers and Their Applications, from Springer Academic Publishing, the "unique characteristic[s]" of fudge "comes from the controlled heating of dairy ingredients in the presence of sugar syrup."

24. Dairy ingredients impart a creamy, rich taste and texture to fudge, because milkfat

---

[9] Cambridge Dictionary, fudge.
[10] Collins Dictionary, fudge.
[11] Macmillan Dictionary, fudge.
[12] International Dairy Federation, Bulletin, 1982.
[13] Hartel R.W., von Elbe J.H., Hofberger R. (2018) Caramel, Fudge and Toffee. In: Confectionery Science and Technology. Springer, Cham. https://doi.org/10.1007/978-3-319-61742-8_10

contains hundreds of lactones, aroma compounds which contribute to its taste.

25. Milkfat melts at mouth temperature (35 °C/95 °F) and does not contribute to a waxy sensation.

26. Alternatives to milkfat, such as vegetable oils, are often used in place of dairy ingredients to reduce cost.

27. These ingredients, like palm and palm kernel oil, are solid at room temperature, and referred to as "hard [vegetable] fats."

28. In contrast to dairy ingredients with milkfat, vegetable oils do not melt at mouth temperature and leave a waxy mouthfeel.

29. The result of substituting vegetable fat for dairy fat is that the resulting "fudge" will provide less satiety, a waxy and oily mouthfeel, and leave an aftertaste.

30. In contrast to fats from dairy ingredients, consumption of vegetable oils is linked to numerous health problems, like increased chances of heart disease and increased cholesterol.

31. Dairy ingredients also contain calcium, vitamins A, D, E, and K, which are absent from hardened vegetable fats.

### III. PRODUCT'S COATING IS MAINLY NON-FUDGE INGREDIENTS

32. When consumers observe the representation "[White] Fudge," they will expect the Product is coated with fudge, understood as made exclusively or predominantly from dairy ingredients based on milkfat.

33. However, the Product's coating is misrepresented as "[White] Fudge" because its fat content is almost entirely from non-dairy fats, and substitutes vegetable oils.

34. A review of the ingredients show that the coating's most predominant fat ingredient is not from dairy, but vegetable oils – palm kernel oil and hydrogenated palm oils – followed by

milk, which contains milkfat, and skim milk powder.

35. However, the coating's fat content is exclusively or predominantly from vegetable oils.

36. Milk contains approximately 12-13% solids, 87-88% water, and 3.5-3.8% milkfat.

37. Skim milk powder is obtained by removing the water from skim milk.

38. The result is a food with between 0.6-1.25% fat, which is only 0.8 g per 100 g.

39. The Product's level of Vitamin D and calcium reveal or would reveal that the amount of milkfat in the Product is substantially less than from vegetable oils, because these figures would be significantly higher if the milkfat level was anywhere close to vegetable oils.

40. Snacks such as pretzels which are coated with ingredients that contain predominantly dairy fat ingredients are not a rare or pricy delicacy such that a reasonable consumer would verify the front label statements by scrutinizing the ingredients.

## IV. OTHER SIMILAR PRODUCTS ARE NOT MISREPRESENTED

41. Defendant sells pretzels coated in "Milk Chocolate."



42. The Milk Chocolate product contains milk chocolate ingredients instead of replacing the high valued milk and chocolate ingredients with lower valued vegetable oils.

43. Other companies sell pretzels covered in white coating but do not mislead consumers by labeling it as "White Fudge."

44. These companies describe their white coated pretzels as "Yogurt Covered" and "White Crème."

7





45. The coatings of these competitor products are made with essentially identical ingredients to the Product, i.e., mainly from vegetable oils.

46. However, these products do not mislead consumers by describing themselves with the term, "[White] Fudge."

47. Whether a product contains fudge and/or ingredients expected in fudge, is basic front label information consumers rely on when making quick decisions at the grocery store.

8

48. The Product contains and makes other representations and omissions which are false or misleading.

49. Reasonable consumers must and do rely on a company to honestly identify and describe the components, attributes, and features of a product, relative to itself and other comparable products or alternatives.

50. The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

51. Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

52. Had Plaintiff and proposed class members known the truth, they would not have bought the Product or would have paid less for it.

53. The Product is sold for a price premium compared to other similar products, for no less than $2.09 per 5 oz, excluding tax or any sales, a higher price than it would otherwise be sold for, absent the misleading representations and omissions.

## Jurisdiction and Venue

54. Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

55. The aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

56. Plaintiff Brittany Haas is a citizen of Illinois.

57. Defendant Aldi Inc. is a Illinois corporation with a principal place of business in Batavia, Kane County, Illinois

58. The class of persons Plaintiff seeks to represent includes persons who are citizens of

different states from which Defendant is a citizen

59. Defendant's retail stores and website

60. Venue is in the Eastern Division in this District because a substantial part of the events or omissions giving rise to these claims occurred in La Salle County, i.e., Plaintiff's purchase, consumption, and/or use of the Product and awareness and/or experiences of and with the issues described here.

## Parties

61. Plaintiff Brittany Haas is a citizen of Ottawa, La Salle County, Illinois.

62. Defendant Aldi Inc. is a Illinois corporation with a principal place of business in Batavia, Illinois, Kane County.

63. Aldi is the common brand of two German-owned supermarket chains with over 10,000 stores in 20 countries and annual sales exceeding $75 billion.

64. Defendant operates more than 2,000 stores across 36 states.

65. Defendant is known for selling the highest quality goods, based on its "no frills" approach which saves costs, that are passed on to the consumer.

66. While Aldi stores sell leading national brands, they sell a large number of products under one of their private label brands, Choceur.

67. Private label products are made by third-party manufacturers and sold under the name of the retailer, or its sub-brands.

68. Previously referred to as "generic" or "store brand," private label products have increased in quality, and often are superior to their national brand counterparts.

69. Products under the Choceur brand have an industry-wide reputation for quality and value.

70. In releasing products under the Choceur brand, Defendant's foremost criteria was to have high-quality products that were equal to or better than the national brands.

71. Defendant is able to get national brands to produce its private label items due its loyal customer base and tough negotiating.

72. That Choceur-branded products met this high bar was proven by focus groups, which rated them above the name brand equivalent.

73. Private label products generate higher profits for retailers because national brands spend significantly more on marketing, contributing to their higher prices.

74. A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands are good alternatives to national brands, and more than 60 percent consider them to be just as good."

75. Private label products under the Choceur brand benefit by their association with consumers' appreciation for the Aldi brand as a whole.

76. The development of private label items is a growth area for Aldi, as they select only top suppliers to develop and produce Choceur products.

77. The Product is sold in Defendant's retail stores and website.

78. Plaintiff purchased the Product on one or more occasions within the statutes of limitations for each cause of action alleged, at Aldi, at locations including 2710 Columbus St Ottawa IL 61350-1006 between June 2021 and September 2021, among other times.

79. Plaintiff believed the Product's coating was made exclusively or predominantly with fudge ingredients, including dairy ingredients from milk fat, instead of mainly vegetable oils.

80. Plaintiff bought the Product because she expected the coating was made exclusively or predominantly with fudge ingredients, including dairy ingredients from milk fat, instead of

11

mainly vegetable oils because that is what the representations said and implied.

81. Plaintiff relied on the words, layout, packaging, and/or images on the Product, on the labeling, statements, and/or claims made by Defendant in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

82. Plaintiff did not expect a product, especially from the Choceur brand, would promise the "[White] Fudge" when its coating was mainly non-fudge ingredients.

83. Plaintiff was aware of other competitor products which did not use the term "fudge" but described themselves as "White Crème" and/or "Yogurt-Covered," and Defendant's identification of the Product as "fudge" affected her purchase decision.

84. Plaintiff was disappointed because she believed the Product's coating was made exclusively or predominantly with fudge ingredients, including dairy ingredients from milk fat, instead of mainly vegetable oils.

85. Plaintiff bought the Product at or exceeding the above-referenced price.

86. Plaintiff would not have purchased the Product if she knew the representations and omissions were false and misleading or would have paid less for it.

87. Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, features, and/or components.

88. The Product was worth less than what Plaintiff paid and she would not have paid as much absent Defendant's false and misleading statements and omissions.

89. Plaintiff intends to, seeks to, and will purchase the Product again when she can do so with the assurance the Product's representations are consistent with its abilities, attributes, and/or composition.

90. Plaintiff is unable to rely on the labeling and representations not only of this Product,

but for other similar fudge-coated products, because she is unsure whether those representations are truthful.

## Class Allegations

91. Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Illinois Class:** All persons in the State of Illinois who purchased the Product during the statutes of limitations for each cause of action alleged; and
>
> **Consumer Fraud Multi-State Class**: All persons in the States of Iowa, Arizona, Ohio, Indiana, Rhode Island, Delaware, Georgia, Alabama, Louisiana, West Virginia, New Mexico, Michigan, Texas, Arkansas, Virginia and Oklahoma, who purchased the Product during the statutes of limitations for each cause of action alleged.

92. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

93. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

94. Plaintiff is an adequate representative because her interests do not conflict with other members.

95. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

96. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

97. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

98. Plaintiff seeks class-wide injunctive relief because the practices continue.

## Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, et seq.

### (Consumer Protection Statute)

99. Plaintiff incorporates by reference all preceding paragraphs.

100. Plaintiff and class members desired to purchase a product where the coating was made exclusively or predominantly with fudge ingredients, including dairy ingredients from milk fat, instead of mainly vegetable oils.

101. Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

102. Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

103. Plaintiff relied on the representations that the Product's coating was made exclusively or predominantly with fudge ingredients, including dairy ingredients from milk fat, instead of mainly vegetable oils.

104. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

### Violation of State Consumer Fraud Acts

### (On Behalf of the Consumer Fraud Multi-State Class)

105. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the above-referenced consumer protection statute and prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

106. Defendant intended that each of members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct, and a reasonable person would in fact be misled by this

deceptive conduct.

107. As a result of Defendant's use or employment of artifice, unfair or deceptive acts or business practices, each of the other members of the Consumer Fraud Multi-State Class have sustained damages in an amount to be proven at trial.

108. In addition, Defendant's conduct showed motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

Breach of Contract

109. Plaintiff entered into a contract with Defendant for purchase of the Product.

110. The terms of the contract provided that the Product's coating was made exclusively or predominantly with fudge ingredients, including dairy ingredients from milk fat, instead of mainly vegetable oils.

111. Defendant breached the contract because the Product did not meet the terms Plaintiff agreed to.

112. Plaintiff was damaged by the breach, and those damages include the purchase price.

Breaches of Express Warranty,
Implied Warranty of Merchantability/Fitness for a Particular Purpose and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.

113. The Product was manufactured, identified, and sold by Defendant and expressly and impliedly warranted to Plaintiff and class members that its coating was made exclusively or predominantly with fudge ingredients, including dairy ingredients from milk fat, instead of mainly vegetable oils.

114. Defendant directly marketed the Product to Plaintiff and consumers through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, and targeted digital advertising.

115. Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires.

116. Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant the Product's coating was made exclusively or predominantly with fudge ingredients, including dairy ingredients from milk fat, instead of mainly vegetable oils.

117. Defendant's representations affirmed and promised that the Product's coating was made exclusively or predominantly with fudge ingredients, including dairy ingredients from milk fat, instead of mainly vegetable oils.

118. Defendant described the Product as one where the coating was made exclusively or predominantly with fudge ingredients, including dairy ingredients from milk fat, instead of mainly vegetable oils, which became part of the basis of the bargain that the Product would conform to its affirmations and promises.

119. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

120. This duty is based on Defendant's outsized role in the market for this type of Product, a trusted retailer known for its quality products and market leader.

121. Plaintiff recently became aware of Defendant's breach of the Product's warranties.

122. Plaintiff provided or will provide notice to Defendant, its agents, representatives, retailers, and their employees.

123. Plaintiff hereby provides notice to Defendant that it has breached the express and implied warranties associated with the Product.

124. Defendant received notice and should have been aware of these issues due to

complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

125. The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

126. The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container or label.

127. The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because she expected its coating was made exclusively or predominantly with fudge ingredients, including dairy ingredients from milk fat, instead of mainly vegetable oils, and she relied on Defendant's skill and judgment to select or furnish such a suitable product.

128. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Negligent Misrepresentation

129. Defendant had a duty to truthfully represent the Product, which it breached.

130. This duty was non-delegable, and based on Defendant's position, holding itself out as having special knowledge and experience in this area, a trusted retailer known for its quality products.

131. Defendant's representations regarding the Product went beyond the specific representations on the packaging, as they incorporated its extra-labeling promises and commitments to quality, transparency and putting customers first.

132. These promises were outside of the standard representations that other companies

may make in a standard arms-length, retail context.

133. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

134. Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Product.

135. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Fraud

136. Defendant misrepresented and/or omitted the attributes and qualities of the Product, that its coating was made exclusively or predominantly with fudge ingredients, including dairy ingredients from milk fat, instead of mainly vegetable oils.

137. Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity of the representations.

138. Defendant knew of the issues described here yet did not address them.

139. Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations.

Unjust Enrichment

140. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated: January 22, 2022

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
60 Cuttermill Rd Ste 409
Great Neck NY 11021
Tel: (516) 268-7080
spencer@spencersheehan.com